CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
3/19/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| STEPHANIE C., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 4:25-cv-00001 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Plaintiff Stephanie C. ("Stephanie") filed suit in this court seeking to overturn the Commissioner of the Social Security Administration's ("Commissioner's") final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434. Stephanie suffers primarily from chronic fatigue syndrome ("CFS") and obesity. On review of her application for DIB, an administrative law judge ("ALJ") concluded that, despite these conditions, Stephanie could still perform light work with additional limitations. Stephanie challenges that conclusion. Because the ALJ failed to fully account for Stephanie's self-described, subjective symptoms in accordance with Fourth Circuit law, the court will remand for further consideration of this issue.

## I.    STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal

quotation omitted). Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.* (internal quotation omitted), but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working, (2) has a severe impairment that

satisfies the Act's duration requirement, (3) has an impairment that meets or equals an impairment listed in the Act's regulations, (4) can return to past relevant work (if any) based on his RFC, and, if not, (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

### A.  Procedural History

On November 16, 2021, Stephanie filed an application for DIB, alleging disability beginning on November 16, 2021.[1] (*See* R. 17–18, 31, 321.) Her date last insured ("DLI")— the date on which she last met the Act's insurance requirement, which is a prerequisite to receiving benefits—was December 31, 2024. (R. 20.) The DLI is the date by which she must establish disability to receive benefits.

Stephanie alleged disability due to myriad conditions, including myopathy, myasthenia gravis, high blood pressure, anxiety-panic disorder, depression, sleep-related breathing disorder, inflammatory breast disease, nerve pain, insomnia, and allergies. (R. 21–23, 289.) Stephanie's claim was denied initially on April 21, 2022, and again upon reconsideration on July 24, 2023. (R. 17.) Stephanie requested a hearing and, along with her counsel, appeared

---

[1] At the hearing and under the advice of counsel, Stephanie amended the alleged onset date of disability to November 16, 2021 (the same day that she filed her current DIB application); she previously claimed disability beginning on January 8, 2018. (R. 18.) Stephanie filed a prior DIB application on February 14, 2019, alleging disability starting on the same date of January 8, 2018. (R. 18.) That application was denied initially and upon reconsideration, but she did not appeal the unfavorable decision, which became final on February 25, 2021. (*Id.*)

before ALJ Holly Munday on March 8, 2024. (R. 17, 47–61.) ALJ Munday denied Stephanie's claim on May 23, 2024. (R. 34.) In summary, the ALJ concluded that Stephanie suffered severe medical impairments—CFS[2] and obesity—but that she retained the RFC to perform light work, with some limitations. (R. 25.) Because a significant number of jobs exist in the national economy that an individual with Stephanie's limitations could perform, the ALJ reasoned that she was not disabled within the meaning of the Act. (R. 33–34.)

On July 18, 2024, Stephanie requested that the Appeals Council review the unfavorable decision, but on November 15, 2024, the Appeals Council denied the request for review. (R. 1–3, 5, 236–38.) On January 14, 2025, Stephanie filed suit, seeking this court's review. (Compl. [ECF No. 1].)

## B.  Legal Framework

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific

---

[2] CFS, or myalgic encephalomyelitis, "causes extreme fatigue that lasts for at least six months. Symptoms worsen with physical or mental activity but don't fully improve with rest." *Myalgic encephalomyelitis/chronic fatigue syndrome (ME/CFS)*, Mayo Clinic (Jan. 17, 2026), *available at* https://www.mayoclinic.org/diseases-conditions/chronic-fatigue-syndrome/symptoms-causes/syc-20360490. The cause is unknown. *Id.* Symptoms may include "extreme exhaustion after physical exercise or mental activity, difficulty with memory or thinking skills, dizziness that gets worse when moving from lying down or sitting to standing, muscle or joint pain, and unrefreshing sleep." *Id.* (cleaned up).

evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step [two] concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is, by definition, "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"— including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explain how she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his conclusion[s]," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## C. Medical Evidence

As noted below, the court finds that the ALJ erred in her consideration of Stephanie's subjectively described symptoms of her CFS. Accordingly, it will not summarize the entire medical record.[3] As relevant to the present issue, however, the court will summarize evidence related to Stephanie's CFS.

Stephanie began reporting symptoms of CFS to physicians in 2018, including chronic fatigue and muscle weakness. (R. 385–87, 467–83, 521–87, 2062–97.) Physicians diagnosed her with chronic pain and weakness, among other disorders, and prescribed her medications to address her allergies, sleep issues, fatigue, and other physical disorders, such as hypertension and elevated blood sugar. (*Id.*) On April 19, 2018, she was diagnosed with an autoimmune disease known as myasthenia gravis,[4] though she was authorized to return to work 20 hours per week on the job and 20 hours per week at home. (R. 2099, 2107.) She continued to report fatigue and headaches through early 2021. (*See, e.g.*, R. 868–77, 883–89.)

On July 15, 2021, Stephanie presented to Dr. Kelly Barbour of VCU Health and reported subjective symptoms of diplopia,[5] postural dizziness, diffuse muscle spasm, myalgia,

---

[3] The court omits information pertaining to Stephanie's history of cardiopulmonary and breast issues and Lyme disease, unless relevant to the CFS analysis.

[4] "Myasthenia gravis is a condition that happens when communication between nerves and muscles breaks down. This causes muscles to feel weak and get tired quickly. . . . The exact cause of myasthenia gravis is not known. Myasthenia gravis is an autoimmune condition." *Myasthenia gravis*, Mayo Clinic (Aug. 22, 2025), *available at* https://www.mayoclinic.org/diseases-conditions/myasthenia-gravis/symptoms-causes/syc-20352036.

ALJ Munday ultimately dismissed the medical diagnoses of myasthenia gravis and, instead, adopted other physicians' opinions that her symptoms were more consistent with CFS. (R. 32.) Because Stephanie's history of myasthenia gravis diagnoses is relevant to the analysis, the court includes that information here.

[5] Diplopia is also known as double vision. *See Diplopia (Double Vision)*, The Cleveland Clinic (Aug. 6, 2024), *available at* https://my.clevelandclinic.org/health/diseases/22203-diplopia-double-vision.

fatigue, muscle fasciculation, difficulty swallowing, and constipation. (R. 390, 713–17, 861–67.) Dr. Barbour opined that Stephanie had severe functional limitations and that she was incapable of sedentary activity. (R. 390-92.)

On January 25, 2022, Stephanie saw Dr. Charles Nwaokocha with the same symptoms. (R. 392, 723–32, 850–60.) Dr. Nwaokocha diagnosed Stephanie with myasthenia gravis and muscle weakness, among other issues. (R. 392, 730.) Stephanie was treated for myasthenia gravis at follow-up appointments at VCU Health between March and July 2022. (R. 393–94, 732–79, 824–49, 1918–35.)

On August 9, 2022, Stephanie saw Dr. Josh Gavin, a rheumatologist, complaining of chronic pain and myalgias. (R. 394–95, 816–23.) Dr. Gavin assessed sicca symptoms, possible Raynaud's disease, diffuse chronic progressive myalgias, double vision, a possible diagnosis of multiple sclerosis, and a family history of similar symptoms. (R. 395, 821.)

Between July 14 and October 20, 2022, Stephanie saw Ashley Wray, Certified Family Nurse Practitioner ("FNP-C"), with muscle weakness, myalgias, double vision, fatigue, weakness, and dizziness. (R. 396, 904–38, 941–98.) FNP-C Wray prescribed various medications and referred Stephanie to additional specialists, but she noted that Stephanie's condition had not improved and likely would not improve in the future, such that Stephanie could not recover to work. (R. 396–97, 905.) FNP-C Wray confirmed the diagnosis of myasthenia gravis and further diagnosed Stephanie with other conditions, including CFS. (*See, e.g.*, R. 397–98, 904–08, 914, 917.) Stephanie continued to receive treatment for suspected myasthenia gravis and other conditions through the end of 2022. (R. 1044–75, 1901–13.)

During this time, she also was assessed by genetics specialists for possible mitochondrial abnormalities. (R. 1830–1900.)

On December 5, 2022, Dr. Joseph Guarino, a state medical examiner, reviewed Stephanie's symptoms and performed a physical exam.[6] (R. 398, 408–15.) At the appointment, Dr. Guarino observed that Stephanie "[i]nitially walked into the office without any limitations; however, she began to experience difficulties . . . during her examination," like rising from a recumbent position, grabbing walls or countertops for assistance, and walking in a "stop and go" fashion. (R. 410.) Based on these observations, as well as on his physical examination, Dr. Guarino confirmed Stephanie's diagnosis of CFS, but opined that her symptoms were inconsistent with myasthenia gravis. (R. 411–12 ("In the opinion of this examiner, she does not meet the diagnostic criteria for myasthenia gravis. [CFS] would explain some of her symptoms[.]").) Dr. Guarino opined that she could not return to her previous occupations but that she was capable of other work, with restrictions. (R. 398, 412.)

On January 5, 2023, Stephanie saw Dr. Natalia Gonzalez for a second opinion on her myasthenia gravis diagnosis. (R. 2410–24.) She had a normal physical examination, with the exception of some eye convergence, and Dr. Gonzalez reported normal muscle tone, bulk, and strength; normal sensation; normal gait; and no ataxia, dysmetria, or tremor. (R. 2414–15.) Due to "negative repetitive nerve stimulation performed [at Duke Health] and at VCU, . . . negative AChR and MUSK antibodies," and no evidence of muscle disease, Dr. Gonzalez also

---

[6] Dr. Guarino reviewed Stephanie's file at the request of The Reed Group of the Virginia Retirement System. (R. 408.)

determined that Stephanie's symptoms were not consistent with myasthenia gravis. (R. 29, 2416–18, 2423.)

On January 24, 2023, Stephanie saw Dr. Habib F. Bassil, a cardiologist, complaining of chest discomfort.[7] (R. 399.) Dr. Bassil considered her symptoms to be possibly related to myasthenia gravis. (R. 398–99.) At an appointment the following month at the CMH Community Memorial Hospital, Nurse Practitioner ("NP") Beverly Utt diagnosed Stephanie with CFS and myasthenia gravis, among other conditions. (R. 399.) Stephanie received care for these conditions through June. (R. 1976–81, 1989–2002.)

On June 24, 2023, Stephanie saw FNP-C Brittany Blowe, a consultant with the Virginia Department of Rehabilitative Services, for an assessment. (R. 400–01, 1103–10.) Stephanie reported that she was previously diagnosed with myasthenia gravis, that she was unable to perform daily activities, and that she was experiencing chronic fatigue and weakness. (R. 400, 1104.) FNP-C Blowe performed an examination and noted that Stephanie had an abnormal gait and station and that Stephanie almost fell several times while performing range of motion tasks. (R. 401, 1104–09.) From these observations, FNP-C Blowe diagnosed Stephanie with myasthenia gravis and opined that she should never lift or carry over 10 pounds; can only stand or walk for two hours in the eight-hour workday; can occasionally reach, handle, feel, and grasp bilaterally; can never bend; and can occasionally stoop, kneel, and squat. (R. 401, 1107–08.) FNCP-C Blowe also opined that Stephanie has communication limitations, given her bilateral hearing loss. (R. 1108.)

---

[7] Stephanie saw Dr. Bassil previously in July 2022 for cardiac issues. (R. 805–13.) She was also assessed for myasthenia gravis at that time. (R. 805.)

Stephanie continued to receive care for her conditions through 2024. (R. 2008–2053.) Finally, on July 4, 2024, FNP-C Wray[8] completed an additional assessment of Stephanie's symptoms. (R. 401.) FNP-C Wray noted that Stephanie's condition had retrogressed, and that she had severe cardiac, physical, and mental impairments. (R. 401–02.) FNP-C Wray considered Stephanie completely disabled and incapable of work due to suspected myasthenia gravis. (R. 402.)

**D. Opinion Evidence**

Bert Spetzler, M.D., and Joseph Leizer, Ph.D., performed an initial review of Stephanie's SSA disability application on April 20, 2022.[9] (R. 93–99.) Dr. Spetzler determined that Stephanie was not disabled, though much of his analysis was based on insufficient evidence pertaining to Stephanie's symptoms and previous medical opinions. (R. 98–99.) Neither he nor Dr. Leizer provided an opinion as to Stephanie's RFC.

Jo McClain, Psy. D., and Daniel Camden, M.D., reconsidered[10] Stephanie's disability application on July 14, 2023.[11] (R. 100–126.) Dr. Camden ultimately concluded that Stephanie's symptoms could reasonably be expected to produce her pain and symptoms, but that her statements regarding her symptoms were only partially consistent with the medical and non-

---

[8] By this date, FNP-C Wray was Board Certified, and her title became "FNP-BC Wray." For consistency, however, the court refers to her as FNP-C Wray.

[9] The Disability Examiner who reviewed their conclusions was LeSonya Baldwin. (R. 99.)

[10] The file was reviewed "to ensure that the total evidence of record is sufficient and consistent to support the proposed determination" by Disability Examiner Stephanie Bright. (R. 114.)

[11] Dr. Camden performed two reconsideration reviews of Stephanie's disability on July 14, 2023. (R. 100–126.) The second reconsideration was treated only as "a special sense review," given Stephanie's visual impairments. (R. 122.) Dr. Camden's findings of no disability and Stephanie's limitations do not differ between the two reviews.

medical evidence. (R. 109 ("Claimant's allegations/symptoms are rapidly kaleidoscopic in nature, making a true determination of her impairment problematic.").) Based on this conclusion, Dr. Camden determined that Stephanie could occasionally lift 10 pounds (but less than 10 pounds frequently); that she could stand or walk, with breaks, for two hours at a time; and sit, with breaks, about six hours out of an eight-hour workday. (R. 110.) Dr. Camden also opined that Stephanie had a range of postural, manipulative, visual, communicative, and environmental limitations. (R. 110–13.) Despite these limitations, Dr. Camden concluded that Stephanie was not disabled and could perform a range of sedentary work, including some of her past relevant work. (R. 112–13, 125–26.)

### E.  Testimonial Evidence

On March 25, 2022, Stephanie completed an Adult Function Report and listed difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, stair climbing, seeing, remembering things, completing tasks, concentrating, understanding, following instructions, and using her hands. (R. 300–311.)[12] In the Report, she testified that she is no longer able to work, drive, partake in professional associations, and exercise due to her symptoms. (R. 301.) She also testified that she has difficulty falling and staying asleep, does not feel rested when she wakes up, requires naps during the day, and needs medication to help her sleep. (*Id.*) She also alleged that she has difficulty dressing, bathing, caring for her hair, shaving, feeding herself, and using the bathroom, and often needs assistance or takes breaks to complete these activities. (R. 301–02.) She further described that she has difficulty preparing

---

[12] Stephanie also stated that she experiences a litany of daily symptoms. (R. 306–07.) For brevity, the court recites only those symptoms relevant to Stephanie's appeal.

- 11 -

meals and concentrating on daily tasks (*e.g.*, that she can pay attention for six to 10 minutes and needs to re-read written instructions), and stated that she needs her husband's assistance to complete most activities. (R. 301–04, 309.) Stephanie testified that she shops for groceries, though she often forgets items and needs to lean on the cart to complete shopping. (R. 304.) She also stated that she can pay bills, count change, handle a savings account, and use a checkbook/money orders, though her symptoms sometimes cause her to lose focus or forget to pay her bills. (R. 304–05.) She testified that her symptoms have impacted her previous hobbies, her ability to get around town, and her opportunities to partake in social activities. (R. 305.)

On October 4, 2022, Stephanie completed a second Adult Function Report. (R. 337–43.) Her responses regarding her limitations and symptoms were largely consistent with the answers given in her March 25 Report.

On March 8, 2024, Stephanie appeared in front of ALJ Munday via videoconference. (R. 47–61.) Stephanie testified to her disabling fatigue that inhibits her ability to drive, focus, and perform her past work in education and programming. (R. 48–49, 58.) She also testified to "muscle fatigue so bad that a little bit of exertion causes [her] hands to numb up[,] tremors, [and] extreme tingling in [her] fingers." (R. 49.) She described daily mental fogginess, headaches, shortness of breath, vision issues, difficulty sleeping, and difficulty remembering things. (R. 49–53.) Stephanie stated that she has difficulty with daily activities, such as tying her shoes, looking at a computer screen, balancing, sitting without cushions for more than a few hours, and lifting grocery bags or frying pans. (R. 51–57.) Stephanie also testified that she requires midday naps in order to function and subdue her migraines and fatigue. (R. 55.) When

- 12 -

asked by the ALJ about her daily activities, Stephanie stated that she is able to get up, bathe herself, and get dressed, but that she needs to take breaks or needs assistance; that she eats cereal, sandwiches, or frozen dinners on the weekdays; that she has difficulty taking a shower and needs to hold onto things for balance; that she needs to sit down while dressing because of the exhaustion; that she watches TV "for a little while"; and that, at dinner, she can put food in the crock pot. (R. 59.)

A vocational expert ("VE") also testified at the March 8 hearing. (R. 61–67.) In response to the ALJ's hypotheticals, the VE testified that a person with Stephanie's conditions could perform all of her past work with frequent field of vision, though all past work would be eliminated with occasional field of vision. (R. 64.) Based on Stephanie's "transferable skills" from past work, the VE also identified available, sedentary work as a receptionist (DOT code 237.367-038); a personnel clerk (DOT code 209.362-026), and a scheduler and planner (DOT code 215.367-014). (R. 65–66.) The VE also opined that, if an individual consistently had two or more unplanned absences per month of was off-task 20 percent of the time, those limitations could eliminate all work. (R. 66.)

## F.  The ALJ's Opinion

The ALJ concluded that Stephanie suffered from CFS and obesity, which are severe impairments. (R. 21.) She found, however, that Stephanie did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 24.) After "careful consideration of the entire record" and giving "significant weight" to the prior, no-disability finding in 2019, *see Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 477–78 (4th Cir. 1999), the ALJ determined that

Stephanie had the RFC to perform light work, *see* 20 C.F.R. §§ 404.1567(b) and 416.967(b), and that Stephanie can

> occasionally stoop, kneel, crouch, and climb ramps and stairs[,] . . . . perform no climbing of ladders, ropes, and scaffolds and she cannot crawl[,] . . . . frequently finger[,] . . . . have occasional exposure to extreme cold or heat[,] . . . . have occasional exposure to vibrations[, and] . . . . have occasional exposure to pulmonary irritants, including fumes, odors, dust[,] and gas. [Stephanie] cannot perform work activities requiring driving. [Stephanie] can frequently perform tasks requiring field of vision.

(R. 25.) As a result, the ALJ determined that Stephanie could perform her past work as an adult teacher, education program coordinator, or health educator and could additionally perform work as a receptionist, personnel clerk, or scheduler/planner. (R. 33–34.) The ALJ therefore concluded that Stephanie was not disabled, as defined in the Act, from the alleged onset date through the date of the decision. (R. 34.)

### III.   ANALYSIS

In this appeal, Stephanie argues that the ALJ failed to account for the limiting effects of her CFS, specifically by improperly evaluating her testimony about her subjective symptoms (*e.g.*, fatigue and difficulty concentrating). (Pl.'s Br. at 1 [ECF No. 12].) The Commissioner maintains that the ALJ's assessment of Stephanie's CFS symptoms are supported by substantial evidence. (Def.'s Br. at 6 [ECF No. 16].) On the present record, Stephanie has the better argument.

When assessing an RFC, an ALJ must consider the entire record to determine the total limiting impacts of a claimant's physical and mental impairments. 20 C.F.R. §§ 404.1545(a)(1)–(3). When an ALJ considers an impairment with "[s]ymptoms [that] cannot always be

measured objectively through clinical or laboratory diagnostic techniques," such as fibromyalgia or CFS,[13] ALJs must conduct a unique, two-step analysis in evaluating those subjective complaints. SSR 16-3p; *see also* 20 C.F.R. § 404.1529(a); *Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 95 (4th Cir. 2020). At the first step, the ALJ must consider "whether objective medical evidence presents a 'medially determinable impairment.'" *Id.* (quoting 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3. Here, ALJ Munday found that Stephanie's CFS and obesity were medically determinable impairments that could reasonably be expected to cause her symptoms, then proceeded to the second step. (R. 21.)

At the second step, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to determine the extent to which the symptoms limit an individual's ability to "to perform work-related functions." SSR 16-3p, 2016 WL 1119029, at *2. At this stage, the claimant may rely solely on subjective testimony or evidence to establish their impairment, *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006), and objective evidence is not required to find the claimant disabled. *See* SSR 16-3p 2016 WL 119029, at *4–5 ("Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques."); *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989) ("[W]hile there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity."). Accordingly, the ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because

---

[13] In this analysis, the court applies the same legal standard for assessing subjective complaints associated with CFS as courts use to assess fibromyalgia symptoms (namely, the standards developed under *Arakas v. Commissioner, Social Security Administration*, 983 F. 3d 83, 98–102 (4th Cir. 2020). The parties do not dispute that CFS presents with primarily subjective symptoms, and, in any event, at least one other court in this circuit has also applied *Arakas* and its progeny to CFS cases. *See, e.g.*, *Lisa C. v. Saul*, No. GLS 20-01179, 2021 WL 3040019, *2–3 (D. Md. July 16, 2021) (R.&R.).

the objective medical evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *4–5). The ALJ, however, "is not required to accept the claimant's statements at face value; rather, the ALJ must 'evaluate whether the statements are consistent with the objective medical evidence and other evidence.'" *Piacitelli v. O'Malley*, No. 7:22-CV-193-FL, 2024 WL 996740, at *6 (E.D.N.C. Feb. 12, 2024) (quoting SSR 16-3p, 2016 WL 1119029, at *6); *see also Craig v. Chater*, 76. F.3d 585, 595 (1996) (explaining that the ALJ must consider whether a claimant's subjective complaints could "reasonably be accepted as consistent with the objective medical evidence and other evidence"), *superseded by statute on other grounds*.

The Fourth Circuit recently refined these standards in *Arakas*, 983 F.3d at 98–102, which Stephanie cites to extensively. In that case, the plaintiff challenged her DIB denial, arguing that the ALJ erred by discrediting her subjective complaints about the severity and persistence of her fibromyalgia pain. *Id.* at 89. The ALJ focused primarily on Arakas's physical exam results, which were generally normal and showed "a full range of motion of the joints and no signs of active joint inflammation, both of which are typical of fibromyalgia," in his finding of no disability. *Id.* at 91, 94. But the Fourth Circuit agreed with Arakas that the ALJ erred by discounting her subjective complaints of her pain and limitations in the face of otherwise normal medical evidence. *Id.* at 96. Because Arakas was entitled to prove her disease with subjective complaints alone, the ALJ "improperly increased her burden of proof" by requiring objective proof of her disease. *Id.* The Fourth Circuit held

> that ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such

evidence. Objective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease. If considered at all, such evidence—along with consistent trigger-point findings—should be treated as evidence *substantiating* the claimant's impairment.

*Id.* at 97–98. Because the ALJ "applied the wrong legal standard . . . . [and] improperly cherry-picked, misstated, and mischaracterized facts from the record," his decision was not supported by substantial evidence. *Id.* at 102.

*Arakas* and its progeny have also established that ALJs may not discredit a claimant's subjective complaints about the intensity of pain merely because the claimant can engage in day-to-day chores, nor can an ALJ cherry-pick evidence from a claimant's good days while discounting the bad. *Id.* at 98–99, 101–02 (reversing because ALJ justified his RFC with claimant's testimony that she could perform daily chores and experienced lower-pain days, but omitted longitudinal testimony that her pain fluctuated and that chores took a long time and caused her great pain). In other words, "an ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023); *see also Arakas*, 983 F.3d at 92 (reversing ALJ's finding that claimant was not disabled because ALJ cited her self-reported ability to do household activities, but ignored her "testimony that she had difficulty" with chores, personal care, using a pen, grocery shopping, and sleeping, and that "she was too tired to do anything after noon due to her worsening fatigue")); *Piacitelli*, 2024 WL 996740, at *8 (finding that ALJ erred and misstated the record by recognizing that claimant could button and zip clothes while

- 17 -

ignoring claimant's self-reported limitations that she spent a long and painful time accomplishing these activities); *Lisa C. v. Saul*, No. GLS 20-01179, 2021 WL 3040019, at *4– 5 (D. Md. July 16, 2021) (R&R) (finding the ALJ erred by considering claimant's ability to engage in household tasks but failing to consider claimant's inability to complete them). On the other hand, an ALJ does not err if she discredits a claimant's testimony based on conflicting statements, if any, about the intensity and persistence of pain for a disease with primarily subjective symptoms. *See Annette P. v. Comm'r, Soc. Sec. Admin.*, No. SAG-21-2798, 2022 WL 4560495, at *4 (D. Md. Sep. 29, 2022) (finding that claimant's hearing testimony about her daily limitations conflicted with her own previous statements about her ability in those same activities); *Valerie S. v. Kijakazi*, No. 22-0916-BAH, 2022 WL 17822658, at *4 (D. Md. Dec. 19, 2022) (R. & R.) (affirming because claimant's testimony about the limiting effects of her pain was inconsistent with her daily admitted activities).

Here, the ALJ cabined her analysis of Stephanie's testimony to a short paragraph:

> The claimant's allegation of "disabling" fatigue, muscle weakness and impaired sight, among other complaints, are out of proportion to the range of activities she reported in the Function Reports and at the hearing. The claimant testified [that she] has to rest for a good portion of the day, and that she is unable to maintain focus due to chronic fatigue, but she also reported being able to prepare her own meals, watch television, and take care of most of her personal needs. The claimant testified to having poor balance but indicated that she did not require an assistive device for ambulation. Her reports of activities in October 2022 included being able to pay bills, count change, handle a savings account, and use a checkbook, (although she noted sometimes forgetting when the bills were due). She also reported having no problems with social interaction.

(R. 31.) Considering Stephanie's testimony along with the other evidence in the record (including treatment and examination records, as well as Stephanie's reported activities), ALJ

- 18 -

Munday determined that she could perform light work with some exertional and environmental limitations. (*Id.*)

At the outset, the court disagrees with Stephanie that ALJ Munday improperly used objective medical evidence to discount her subjective symptoms. To be sure, the ALJ recited the objective evidence in the record, but mainly to support the ultimate environmental and postural limitations that she incorporated into the RFC and to explain why she discounted medical opinions of certain providers who previously diagnosed Stephanie with myasthenia gravis. (*See* R. 31 ("Ms. Blowe included the diagnoses of myasthenia gravis in her report, while Dr. Gonzalez made it clear that examination findings, laboratory tests, and diagnostic tests were not consistent with the diagnosis of myasthenia gravis. The undersigned finds the evidence is most consistent with the diagnoses of [CFS] and obesity[.]").) Based on these observations, the court is not persuaded that the ALJ recognized Stephanie's subjective complaints, and then analyzed those complaints against objective medical evidence to discredit it, as *Arakas* prohibits. 983 F.3d at 97–98. While ALJs may not use objective evidence, even as one factor, to *discredit* subjective symptoms, they may still assess *the consistency* of evidence— both subjective and objective—against the larger record. *Compare id.*, 983 F.3d at 97*, with Craig*, 76 F.3d at 595. ALJ Munday's analysis falls into the latter category.

But this does not save the ALJ's opinion from reversal, because it suffers from the same flaws that resulted in the remand of *Arakas* and similar cases. Most obviously, ALJ Munday considered the *type* of activities that Stephanie self-reported, but she did not consider the *extent* to which Stephanie stated she could perform them. *See Woods*, 888 F.3d at 694. To be sure, ALJ Munday reiterated some of Stephanie's testimony regarding her difficulty

focusing and the impact of her fatigue, albeit in the *allegations* section of her opinion. *See* (R. 27–28 (describing Stephanie's reports of difficulty focusing, staying alert, participating in daily activities, experiencing headaches, requiring midday naps, and more).) But ALJ Munday primarily focused on Stephanie's ability to "prepare her own meals, watch television, and take care of most of her personal needs" and to "pay bills, count change, handle a savings account, and use a checkbook" to minimize the "disabling" effects of Stephanie's fatigue. (R. 31.) In so doing, the ALJ ignored certain statements in Stephanie's hearing testimony and Adult Function Reports, where she attested that she either takes a longer-than-average time to do these activities or, alternatively, limits the activities she can do to a few minutes because of the pain. (R. 59, 301–04, 338-44.) And this case is not one in which an ALJ is confronted with prior, inconsistent self-reports of subjective symptoms, *see, e.g.*, *Annette P.*, 2022 WL 4560495, at *4; in fact, Stephanie reported consistent symptoms and limitations in her previous medical encounters, hearing testimony, and two Adult Function Reports. (*See, e.g.*, R. 47–61, 300–11, 337–44.) Therefore, ALJ Munday's analysis is squarely at odds with *Woods* and *Arakas*. 888 F.3d at 694; 83 F.3d at 92.

ALJ Munday ultimately justified her determination that Stephanie could engage in light work, with limitations, by highlighting a few of Stephanie's daily activities, like paying bills, balancing a checkbook, and personal care tasks, while glossing over her physical and mental restrictions. *See Piacitelli*, 2024 WL 996740, at *8. Without further explanation, the court is at a loss as to how the ALJ built an "accurate and logical bridge" between these limited, commonplace, and essential activities and the work described in the RFC. *Clifford*, 227 F.3d at 872. At bottom, the ALJ failed to consider Stephanie's self-reported symptoms, which

impinges upon this court's review. Therefore, the ALJ's opinion is not based on substantial

evidence and will be reversed.

## IV.    CONCLUSION

For the foregoing reasons, the court will remand this matter to the Commissioner for

further proceedings consistent with this Opinion.

The Clerk is directed to forward a copy of this Memorandum Opinion and the

accompanying Order to the parties.

**ENTERED** this 19th day of March, 2026.


                                        */s/ Thomas T. Cullen*_____
                                        HON. THOMAS T. CULLEN
                                        UNITED STATES DISTRICT JUDGE

- 21 -